T.C. Memo. 2014-218

UNITED STATES TAX COURT

KIM REINHART, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent.

Docket No. 25917-11L.                    Filed October 16, 2014.

<u>Mitchell I. Horowitz</u> and <u>Micah G. Forgarty</u>, for petitioner.

<u>Miriam C. Dillard</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  The petition in this case was filed in response to a

Decision Letter Concerning Equivalent Hearing under Section 6320 and/or 6330

of the Internal Revenue Code (decision letter) upholding a collection action

regarding a notice of Federal tax lien (NFTL) filed on March 15, 2011, for the tax

[*2] period ending June 30, 1992. The parties have stipulated that petitioner timely requested a collection due process (CDP) hearing as to the March 15, 2011, NFTL, that the settlement officer should have issued a notice of determination rather than a decision letter, and that the decision letter should be treated as a notice of determination under section 6330(d)(1) for jurisdictional purposes. See Craig v. Commissioner, 119 T.C. 252, 259 (2002).

The issue for consideration is whether respondent is time barred from collecting a trust fund recovery penalty for the tax period ending June 30, 1992 (1992 trust fund recovery penalty).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The parties' stipulations of facts, with accompanying exhibits, are incorporated herein by this reference.

**[\*3]** Petitioner and her husband, Byron Hatcher, were married in 1991 and remain married. The mailing address used at the time of filing this petition is a mailbox at a Pack Mart shipping business in Sebastian, Florida.

Petitioner was born in the United States and spent her childhood in the United States. Petitioner attended, but did not complete, college. Petitioner began her career in the early 1990s providing secretarial services including accounting and bookkeeping services.

In the early 1990s petitioner had a secretarial and bookkeeping services company in Daytona, Florida. This business lasted until 1996. Petitioner worked full time for her company, and she had no clients outside the United States.

In late 1996 petitioner's husband and Mr. Uhrig, a friend and business associate of petitioner, began a business venture called American Barristers which provided trust formation and incorporation services. Some of the business entities were incorporated in the Carribean. Petitioner handled the accounting aspects of these entities and trusts. Petitioner also performed bookkeeping services for Mr. Uhrig.

Petitioner had ownership interests in several entities, including Equity Mutual Funding, Inc. Petitioner had signature authority for a bank account of

[*4] Prudential Trustees and initiated numerous transfers of funds by mail, telephone, and facsimile.

In February 1991 petitioner and her husband purchased a home in Ponce Inlet, Florida, where they resided until the home was sold in May 1994. Petitioner moved into a condominium in Daytona Beach, Florida, which was purchased in May 1994 and sold in 1997. From 1999 until 2002 petitioner resided in a townhouse in Grant, Florida. In June 2002 petitioner moved to a boat that she and her husband owned and moored in City of Fort Pierce, Florida. Petitioner resided there until Hurricane Frances destroyed the boat in 2004. Petitioner did not use the boat to travel. In 2002 petitioner's husband rented an apartment in the Bahamas.

After Hurricane Frances destroyed her and her husband's boat, petitioner moved into a condominium in Sebastian, Florida, owned by her in-laws. In November 2004 petitioner purchased a condominium in Vero Beach, Florida, and she moved into this condominium in May 2005 when construction was completed. In September 2006 petitioner purchased a recreational vehicle kept at Lake Marian Paradise in Kenansville, Florida, until May 2011.

On July 15, 1993, respondent assessed the 1992 trust fund recovery penalty against petitioner for $59,374. This penalty is associated with one of petitioner's

[*5] clients who added her as a signatory to its bank account. On July 26, 1993, respondent filed a notice of lien against petitioner in Volusia County, Florida. The notice of lien stated that "unless notice of lien is refiled by * * * [August 14, 2002], this notice shall constitute the certificate of release of lien as defined in IRC 6325(a)." Respondent did not refile the notice of lien by August 14, 2002, and the notice of lien was automatically released. On or around December 30, 2010, respondent filed a Form 12474-A, Revocation of Certificate of Release of Federal Tax Lien, in Volusia County, Florida, with respect to the 1992 trust fund recovery penalty.

Petitioner and her husband filed a joint Federal income tax return for 2001 in February 2004. That 2001 return was mailed from the Bahamas in August 2003 and lists a Bahamian mailing address for petitioner and her husband. Petitioner and her husband's 2002, 2003, and 2004 joint tax returns list the same Bahamian mailing address. Petitioner's 2004 joint tax return included a Schedule C-EZ, Net Profit From Business, which listed a Bahamian mailing address for her consulting business.

On February 8, 2011, respondent mailed petitioner a Notice of Federal Tax Lien Filing and Your Right to a Hearing under IRC 6320, informing her that respondent had filed an NFTL with respect to the 1992 trust fund recovery

[*6] penalty. This NFTL was not recorded in the county of petitioner's last known address. On March 15, 2011, respondent mailed petitioner a second Notice of Federal Tax Lien Filing and Your Right to a Hearing under IRC 6320, informing her that respondent had filed an NFTL (this time, in the county of petitioner's last known address) with respect to the 1992 trust fund recovery penalty. This notice was mailed to the mailbox at Pack Mart in Sebastian, Florida, and this address was the last known address for petitioner.

On April 18, 2011, petitioner submitted a timely Form 12153, Request for a Collection Due Process or Equivalent Hearing (CDP hearing request), in response to the March 15, 2011, NFTL. Petitioner alleged that the filing of the NFTL was time barred.

Between July and September 2011 petitioner and a settlement officer spoke at least six times over the phone. For at least one of those conversations, the settlement officer initiated the call and reached petitioner on her cell phone, which had an area code that covered portions of central Florida.

On August 22, 2011, petitioner and the settlement officer had a telephone discussion during which petitioner stated that she had been unable to get her travel records from the Department of Homeland Security. The settlement officer told her that she did not need to provide those records to him but that he would

[*7] consider other documentation, such as a utility bill, that showed a United States address other than a mailbox. On September 14, 2011, the settlement officer received from petitioner copies of summonses, a copy of her passport pages, and other documentation.

On September 21, 2011, petitioner and the settlement officer held a telephone CDP hearing. The settlement officer told petitioner that he had reviewed the documents she gave him and none of the documents proved that she resided in the United States.

Respondent's administrative record include travel dates for petitioner from Department of Homeland Security records. These travel records show the following:

| Arrival/Departure | Date |
| --- | --- |
| Arrival in Fla. | 1/16/2001 |
| Arrival in Fla. | 2/19/2001 |
| Arrival in Fla. | 5/5/2001 |
| Arrival in Fla. | 6/20/2001 |
| Arrival in Fla. | 9/24/2001 |
| Arrival in Fla. | 3/25/2002 |
| Arrival in Fla. | 5/27/2002 |
| Arrival in Fla. | 6/17/2002 |
| Arrival in Fla. | 6/30/2002 |

| | |
|---|---|
| [*8] Arrival in Fla. | 7/27/2002 |
| Arrival in Fla. | 8/18/2002 |
| Arrival in Fla. | 9/3/2002 |
| Arrival in Fla. | 9/5/2002 |
| Arrival in Fla. | 9/28/2002 |
| Arrival in Fla. | 11/11/2002 |
| Arrival in Fla. | 11/13/2002 |
| Arrival in Fla. | 12/1/2002 |
| Arrival in Fla. | 12/4/2002 |
| Departure to Nassau | 12/13/2002 |
| Arrival in Fla. | 12/14/2002 |
| Arrival at Hopkins International (Cleveland, Ohio) from Dorval Montreal | 12/31/2002 |
| Departure to Nassau | 1/8/2003 |
| Departure to Nassau | 1/14/2003 |
| Departure to Nassau | 1/24/2003 |
| Arrival in Fla. | 1/29/2003 |
| Departure to Nassau | 2/27/2003 |
| Arrival in Fla. | 3/7/2003 |
| Departure to Nassau | 4/6/2003 |
| Arrival in Fla. | 4/11/2003 |
| Departure to Nassau | 4/16/2003 |
| Arrival in Fla. | 5/1/2003 |

| | |
|---|---|
| **[*9]** Departure to Nassau | 5/21/2003 |
| Arrival in Fla. | 6/5/2003 |
| Departure to Nassau | 6/23/2003 |
| Arrival in Fla. | 7/14/2003 |
| Departure to Nassau | 8/16/2003 |
| Arrival in Fla. | 8/23/2003 |
| Departure to Nassau | 9/7/2003 |
| Arrival in Fla. | 9/14/2003 |
| Departure to Nassau | 9/28/2003 |
| Arrival in Fla. | 10/3/2003 |
| Departure to Nassau | 11/2/2003 |
| Arrival in Fla. | 11/6/2003 |
| Departure to Nassau | 12/1/2003 |
| Arrival in Fla. | 12/5/2003 |
| Arrival in Fla. | 2/10/2004 |
| Arrival in Fla. | 3/2/2004 |
| Arrival in Fla. | 4/8/2004 |
| Departure to Nassau | 4/30/2004 |
| Arrival in Fla. | 5/10/2004 |
| Departure to Nassau | 6/16/2004 |
| Arrival in Fla. | 7/1/2004 |
| Departure to Nassau | 7/29/2004 |
| Arrival in Fla. | 8/30/2004 |
| Departure to Nassau | 8/25/2004 |

| | |
|---|---|
| **[*10]** Departure to Nassau | 8/31/2004 |
| Arrival in Fla. | 8/30/2004 |
| Arrival in Fla. | 9/1/2004 |
| Arrival in Fla. | 9/29/2004 |
| Arrival in Fla. | 10/8/2004 |
| Departure to Nassau | 11/4/2004 |
| Arrival in Fla. | 11/16/2004 |
| Departure to Nassau | 12/2/2004 |
| Arrival in Fla. | 12/8/2004 |
| Departure to Nassau | 1/3/2005 |
| Arrival in Fla. | 1/11/2005 |
| Departure to Nassau | 2/10/2005 |
| Arrival in Fla. | 2/17/2005 |
| Departure to Nassau | 3/6/2005 |
| Arrival in Fla. | 3/8/2005 |
| Arrival in Fla. | 5/2/2005 |
| Departure to Nassau | 5/18/2005 |
| Arrival in Fla. | 5/25/2005 |
| Departure to Nassau | 6/23/2005 |
| Departure to Nassau | 6/26/2005 |
| Arrival in Fla. | 7/7/2005 |
| Departure to Nassau | 9/12/2005 |
| Arrival in Fla. | 9/16/2005 |
| Departure to Nassau | 10/31/2005 |

| | |
|---|---|
| **[*11]** Arrival in Fla. | 11/5/2005 |
| Departure to Nassau | 10/5/2006 |
| Arrival in Fla. | 10/10/2006 |
| Departure to Nassau | 11/27/2006 |
| Arrival in Fla. | 11/30/2006 |
| Arrival in Fla. | 1/31/2007 |
| Departure to Nassau | 1/24/2007 |
| Arrival in Fla. | 1/31/2007 |
| Departure to Nassau | 3/1/2007 |
| Arrival in Fla. | 3/12/2007 |
| Departure to Nassau | 3/29/2007 |
| Arrival in Fla. | 5/4/2007 |
| Departure to Nassau | 5/21/2007 |
| Arrival in Fla. | 6/4/2007 |
| Departure to Nassau | 6/17/2007 |
| Arrival in Fla. | 6/28/2007 |
| Departure to Nassau | 7/3/2007 |
| Arrival in Fla. | 7/13/2007 |
| Departure to Nassau | 7/22/2007 |
| Arrival in Fla. | 8/7/2007 |
| Departure to Nassau | 8/24/2007 |
| Arrival in Fla. | 9/1/2007 |
| Departure to Nassau | 9/27/2007 |
| Arrival in Fla. | 10/5/2007 |

| | |
|---|---|
| **[*12]** Departure to Nassau | 11/5/2007 |
| Arrival in Fla. | 11/17/2007 |
| Departure to Nassau | 11/30/2007 |
| Arrival in Fla. | 12/13/2007 |
| Departure to Nassau | 1/15/2008 |
| Arrival in Fla. | 1/26/2008 |
| Departure to Nassau | 2/17/2008 |
| Arrival in Fla. | 2/29/2008 |
| Departure to Nassau | 3/27/2008 |
| Arrival in Fla. | 4/6/2008 |
| Departed to Zurich, Switzerland | 4/13/2008 |
| Arrived in FL from Zurich | 4/30/2008 |
| Departure to Nassau | 5/1/2008 |
| Arrival in Fla. | 5/9/2008 |
| Departure to Nassau | 5/26/2008 |
| Arrival in Fla. | 7/2/2008 |
| Departure to Nassau | 7/22/2008 |
| Arrival in Fla. | 8/7/2008 |
| Departure to Nassau | 8/14/2008 |
| Arrival in Fla. | 9/2/2008 |
| Departure to Amsterdam from Tenn. | 9/18/2008 |

| | |
|---|---|
| **[\*13]** Arrival in Tenn. from Amsterdam | 10/2/2008 |
| Departure to Nassau | 10/14/2008 |
| Arrival in Fla. | 10/29/2008 |
| Departure to Santo Domingo | 11/29/2008 |
| Arrival in Fla. from Santo Domingo | 12/10/2008 |
| Departure to Santo Domingo | 12/28/2008 |
| Arrival in Fla. from Santo Domingo | 1/5/2009 |
| Arrival in Fla. | 2/28/2009 |
| Departure to Nassau | 2/23/2009 |
| Departure to Nassau | 3/30/2009 |
| Arrival in Fla. | 5/6/2009 |
| Departure to Nassau | 5/28/2009 |
| Arrival in Fla. | 7/23/2009 |
| Departure to Nassau | 8/11/2009 |
| Arrival in Fla. | 8/17/2009 |
| Arrival in Fla. | 10/20/2009 |
| Departure to Nassau | 11/8/2009 |
| Arrival in Fla. | 11/13/2009 |
| Departure to Nassau | 12/5/2009 |
| Arrival in Fla. | 12/16/2009 |
| Departure to Nassau | 12/31/2009 |

| [*14] Arrival in Fla. | 1/13/2010 |
|---|---|
| Departure to Nassau | 2/17/2010 |
| Arrival in Fla. | 2/20/2010 |
| Departure to Nassau | 4/6/2010 |
| Arrival in Fla. | 5/6/2010 |
| Departure to Nassau | 5/18/2010 |
| Arrival in Fla. | 7/2/2010 |
| Departure to Nassau | 7/10/2010 |

On August 7, 2006, petitioner signed a declaration submitted to the U.S. District Court for the Southern District of Florida stating that petitioner and her husband lived in Nassau, Bahamas, and that the Vero Beach, Florida, residence never was intended to be their residence.

On October 13, 2011, respondent issued to petitioner the decision letter sustaining the filing of the NFTL.

OPINION

I. Evidentiary Issue

Respondent objected to Exhibit 47-J, an Internal Revenue Service (IRS) memorandum regarding petitioner's husband with respect to a different tax matter, on the grounds of hearsay and attorney-client privilege. On February 3, 2014, respondent filed a status report providing information and exhibits pertaining to

[*15] respondent's objection on the ground of attorney-client privilege. Respondent withdrew the attorney-client privilege objection in respondent's posttrial answering brief and raised a relevance objection to Exhibit 47-J.

Respondent contends that Exhibit 47-J is irrelevant because it does not reference the specific tax periods of petitioner's separate liabilities, the total amount due, or the collection actions taken by respondent.  Petitioner contends that the exhibit bears strong probative value in establishing how actively respondent was actually trying to collect petitioner's tax liabilities before the period of limitations expired.

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action.  Fed. R. Evid. 401.  Exhibit 47-J concerns petitioner's husband with respect to a different tax matter and is not relevant to collection of the 1992 trust fund recovery penalty.  Therefore, Exhibit 47-J is not admitted.

II.   Trust Fund Recovery Penalty

Section 6672(a) imposes a penalty--commonly referred to as the trust fund recovery penalty--for willfully failing to collect, account for, and pay over income and employment taxes of employees.  This penalty is assessed and collected in the same manner as taxes against a person who is "an officer or employee of a

[*16] corporation * * * who as such officer, [or] employee * * * is under a duty to perform", in this case, the duties to which section 6672 refers. Sec. 6671. Such persons are referred to as "responsible persons", a term which may be broadly applied. Mason v. Commissioner, 132 T.C. 301, 321 (2009).

III. CDP Generally

Section 6320(a)(1) requires the Secretary to provide written notice to a taxpayer when the Secretary has filed an NFTL against the taxpayer's property and property rights. See also sec. 6321. Additionally, the Secretary must notify the taxpayer of his or her right to a collection due process hearing. Sec. 6320(a)(3)(B) and (C).

If the taxpayer requests a CDP hearing, the hearing is conducted by the Appeals Office. Sec. 6320(b)(1). At the hearing the taxpayer may raise any relevant issue relating to the unpaid tax or the proposed collection action. Secs. 6320(c), 6330(c)(2)(A). Once the settlement officer makes a determination, the taxpayer may appeal the determination to this Court. Secs. 6320(c), 6330(d)(1).

Section 6330(d)(1) provides this Court with jurisdiction to review an appeal from the Commissioner's determination to proceed with collection activity. Respondent admitted that the settlement officer should have issued a Notice of Determination Concerning Collection Action(s) under Section 6320 and/or 6330

**[\*17]** (notice of determination) instead of the decision letter. Respondent

concedes that the decision letter should be treated as a notice of determination for

jurisdictional purposes.[1] See Craig v. Commissioner, 119 T.C. at 259.

IV.    Petitioner's Contention

Petitioner contends that respondent is time barred from collecting the 1992

trust fund recovery penalty because the 10-year period of limitation expired under

section 6502(a)(1) on July 15, 2003. Section 6502(a)(1) provides generally that if

the assessment of any tax imposed by the code is made within the relevant period

of limitation, then the tax may be collected by levy as long as the levy is made

within 10 years after the assessment. The amount of any tax imposed generally

must be assessed within three years after the tax return is filed. Sec. 6501(a). The

parties do not dispute that the July 15, 1993, assessment took place within the

three-year period of limitations for assessment.

---

[1]Respondent acknowledges that the February 8, 2011, notice and NFTL were not mailed to petitioner's last known address. Respondent acknowledges also that the March 15, 2011, notice and NFTL constitute a "substitute CDP notice". See sec. 301.6320-1(b)(2), Q&A-B3, (c)(3), Example (4), Proced. & Admin. Regs. As a result, petitioner's request for a CDP hearing was timely and the settlement officer erred in treating petitioner's CDP hearing as an equivalent hearing and issuing a decision letter instead of a notice of determination.

**[*18]** V.    <u>Burden of Production and Proof</u>

The bar of the statute of limitations is an affirmative defense, and the party raising this defense must specifically plead it and prove it.  Rules 39, 142(a)(1); Hoffman v. Commissioner, 119 T.C. 140, 146 (2002).  Consequently, a taxpayer who raises the 10-year period of limitations as an affirmative defense must establish a prima facie case that the period of limitations on collection has expired by proving that the Commissioner filed the NFTL after the expiration of the period of limitations on collection.  Jordan v. Commissioner, 134 T.C. 1, 5-6 (2010).  If the taxpayer establishes such a prima facie case, the burden of production then shifts to the Commissioner to prove that an exception to the period of limitations applies.  See sec. 6502(a)(2); Jordan v. Commissioner, 134 T.C. at 6.  The burden of proof, i.e., the ultimate burden of persuasion, never shifts from the party who pleads the bar of the period of limitations on collection.  Jordan v. Commissioner, 134 T.C. at 6.

The March 15, 2011, NFTL was filed well beyond 10 years after the June 15, 1993, date upon which petitioner's 1992 trust fund recovery penalty liability was assessed.  Petitioner has established a prima facie case that the statute of limitations precludes respondent from collecting the 1992 trust fund recovery penalty.  See Jordan v. Commissioner, 134 T.C. at 5 (holding that the reasoning of

[*19] a case regarding the three-year period of limitations on assessment also applies to the 10-year period of limitations on collection); Hoffman v. Commissioner, 119 T.C. at 146 (finding that the taxpayer established a prima facie case that the relevant assessment was made outside the three-year period of limitations under section 6501(a)). The burden of production shifts to respondent. See Hoffman v. Commissioner, 119 T.C. at 146. Respondent must introduce evidence that collection is not barred by the 10-year period of limitations. See id. If respondent makes such a showing, the burden of going forward with the evidence shifts back to petitioner. See id. Notwithstanding the shifting of the burden of going forward, the burden of proof remains with petitioner. See id.

VI.    Standard of Review

Where the validity of the underlying tax liability is properly at issue, we review the determination de novo. Sego v. Commissioner, 114 T.C. 604, 609-610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). Where the validity of the underlying tax liability is not properly at issue, we review the determination for abuse of discretion. Hoyle v. Commissioner, 131 T.C. 197, 200 (2008); Goza v. Commissioner, 114 T.C. at 182.

We have held that a challenge to the 10-year period of limitations on collection is a challenge to the underlying liability. E.g., Jordan v. Commissioner,

**[*20]** 134 T.C. at 8; Hoffman v. Commissioner, 119 T.C. at 145; Boyd v.

Commissioner, 117 T.C. 127, 130 (2001). Because it is a challenge to the

underlying liability, a taxpayer may dispute the underlying liability at the Appeals

Office hearing (and have such a dispute reviewed by this Court) only if the

taxpayer did not receive a statutory notice of deficiency for such tax liability or did

not otherwise have an opportunity to dispute it. Sec. 6330(c)(2)(B). Petitioner

had no prior opportunity to raise the issue of the underlying liability on the basis

of the expiration of the 10-year period of limitations on collection. See Jordan v.

Commissioner, 134 T.C. at 8. Therefore, we will review de novo[2] whether the

period of limitations under section 6502 expired as to collection of the 1992 trust

fund recovery penalty.

Under a de novo standard of review, we consider all of the relevant

evidence introduced at trial. Respondent contends that the Court should not

consider any evidence that was not in the administrative record at the time of the

Appeals hearing. See Murphy v. Commissioner, 469 F.3d 27 (1st Cir. 2006), aff'g

---

[2]Respondent argues, on the basis of Roberts v. Commissioner, T.C. Memo. 2004-100, that the abuse of discretion standard is the applicable standard of review. Roberts is factually distinguishable from this case. Moreover, because Jordan v. Commissioner, 134 T.C. 1 (2010), Hoffman v. Commissioner, 119 T.C. 140 (2002), and Boyd v. Commissioner, 117 T.C. 127 (2001), are directly on point, we follow them. See Jordan v. Commissioner, 134 T.C. at 8 n.6.

**[*21]** 125 T.C. 301 (2005).  Since this is a de novo review, we will consider all evidence and not just the administrative record.  Jordan v. Commissioner, 134 T.C. at 9.

VII.  Period of Limitations on Collection

    A.      Statutory Framework

        1.      Code

Section 6502 provides that "[w]here the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun--(1) within 10 years after the assessment of the tax".  Section 6503(c) provides that "[t]he running of the period of limitations on collection after assessment prescribed in section 6502 shall be suspended for the period during which the taxpayer is outside the United States if such period of absence is for a continuous period of at least 6 months."

        2.      Regulations

Section 301.6503(c)-1(b), Proced. & Admin. Regs., provides:

> The running of the period of limitations on collection after assessment prescribed in section 6502 * * * is suspended for the period * * * during which the taxpayer is absent from the United States if such period is a continuous period of absence from the United States extending for 6 months or more.  * * *.  The taxpayer

**[\*22]** will be deemed to be absent from the United States for purposes of this section if he is generally and substantially absent from the United States, even though he makes casual temporary visits during the period. \* \* \*

B.    Parties' Arguments

Respondent contends that section 301.6503(c)-1(b), Proced. & Admin. Regs., is a valid interpretation of section 6503(c) because the phrase "continuous period" is sufficiently vague, such that Congress did not directly speak to the precise issue, and the interpretation of section 301.6503(c)-1(b), Proced. & Admin. Regs., is not arbitrary, capricious, or manifestly contrary to the statute. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-844 (1984) (holding that an agency's interpretation of a statute is given deference if (1) Congress has not directly spoken to the precise question at issue and (2) the agency's chosen interpretation is reasonable and not arbitrary or capricious in substance or manifestly contrary to the statute); see also Carlebach v. Commissioner, 139 T.C. 1, 9-10 (2012).  In particular, respondent notes that "continuous" does not necessarily mean "uninterrupted".  Respondent further contends that petitioner resided in the Bahamas and any traveling she did to the United States during the six-month periods consisted of casual and temporary visits, such that the period of limitations was tolled.

**[*23]** Petitioner contends that section 6503(c) is not ambiguous and therefore, the statute must be applied according to its plain meaning. See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967 (2005). Petitioner further contends that section 301.6503(c)-1(b), Proced. & Admin. Regs., is invalid. See United States v. Nesline, 590 F. Supp. 884 (D. Md. 1984).

C.      Discussion

There is no need to decide whether section 301.6503(c)-1(b), Proced. & Admin. Regs., is valid. Assuming, for the sake of argument, that the regulation is valid, the record nevertheless does not support respondent's claim that petitioner was generally and substantially absent for six-month periods and made only casual and temporary visits to the United States.

D.      Petitioner's Positions

Petitioner provided testimony concerning where she lived throughout the relevant period. Petitioner testified that she lived in Grant, Florida, from approximately 1999 through June 2002, and then she lived in Fort Pierce, Florida, on a boat. Petitioner testified that Hurricane Frances destroyed the boat on September 6, 2004. Petitioner testified that after the boat was destroyed, she stayed with her in-laws in Sebastian, Florida, for about four months. Mr. Uhrig testified that petitioner lived in her in-laws condominium in Sebastian, Florida,

[*24] after the hurricane.  Petitioner provided documents from the City of Fort Pierce Financing Department that showed fees associated with the docking of petitioner's boat.  These documents show the last name of petitioner's husband and an address in Nassau, Bahamas.  Petitioner testified that the address was an address that her husband was using at the time and she would pick up the statements in person.  Petitioner testified that she purchased a condominium at the end of 2004 in the name of Culver P. Holding, Inc., and she moved into it in the spring of 2005.

Petitioner testified that she originally bought the condominium as a real estate investment that she would fix up and sell.  This condominium has not been sold, and petitioner testified that the Government placed an alter ego lien on the property.

Petitioner testified that she owned, in addition to the above property, a recreational vehicle which was kept at Lake Marian Paradise in Kenansville, Florida.  This vehicle was purchased in 2006, and petitioner placed this vehicle in storage in 2011.  Petitioner testified that she stayed at this vehicle on a continuing basis from September 2006 to 2011, and she provided receipts from Lake Marian Paradise which show August 17, 2006, as the check-in date and November 30,

[*25] 2011, as the check-out date. This vehicle was purchased through a company that petitioner owned.

Petitioner testified that she obtained a mailbox at the Pack Mart in Sebastian, Florida, because her property in Grant, Florida, on Highway 1 had a mailbox that was frequently hit by cars. Petitioner testified that Pack Mart provided a more secure location for receiving mail and that she has had the mailbox since 1999 or 2000.

Petitioner testified that she became ill in 2004 while in the Bahamas and she was treated at Doctors Hospital in the Bahamas. Petitioner testified that she had her followup care in Florida.

Petitioner testified that her husband rented a furnished one-bedroom apartment in Nassau, Bahamas, and the lease was from September 2002 until February 2012. Petitioner testified that she did not travel as often as her husband but would travel to Nassau for two to three days at a time. Petitioner testified that she considered herself to reside in the United States; and to support her position, petitioner provided a Florida driver's license and proof of automobile insurance. Petitioner testified that she had health insurance in the United States.

Mr. Uhrig testified that petitioner was living in Grant, Florida, in the 1990s and early 2000s and that she lived on a boat in Fort Pierce, Florida, in 2004. He

[*26] testified that petitioner spent more time in the United States than her husband and that she was in the United States more than she was in the Bahamas.

Department of Homeland Security documents showed that petitioner traveled frequently between Florida and Nassau, Bahamas, from 2000 to 2010. Petitioner testified that sometimes she would be through customs and because of the weather or a mechanical failure the flight would be canceled. This would result in passport records' showing consecutive arrivals. Petitioner provided copies of pages from her passport for relevant years. Petitioner testified that she has not left the United States since February 8, 2012, and she has been residing at the Vero Beach condominium that she purchased in 2004.

In June 2001 petitioner received documents from the Department of Homeland Security pursuant to her Freedom of Information Act Request. According to these records and her passport records, petitioner was never out of the United States for a six-month period. According to these records, petitioner was outside the United States for 35 days in 1997, 16 days in 1998, 10 days in 1999, 16 days in 2000, 34 days in 2001, 102 days in 2002, and 116 days in 2003.

Petitioner testified that in the early 1990s she had a secretarial business that offered accounting and bookkeeping services. This business was in Daytona, Florida, and petitioner was the owner-operator. This business continued until the

[*27] mid-1990s, and petitioner did not have any customers outside the United States. Petitioner testified that this business was not outside the United States, but she was not able to name specific customers. After this business ended petitioner with her husband invested in real estate.

Petitioner testified that she had a working relationship with Mr. Uhrig, who had a business relationship with her husband. Mr. Uhrig had a law firm called American Barristers in Orlando, Florida, and petitioner provided accounting services, including management of his Interest on Lawyer Trust Accounts. American Barristers also had a separate office in the Bahamas. Petitioner testified that she was doing this work through 2004 and that she had other customers in Florida, but she did not identify them.

Mr. Uhrig testified that he owned a law firm called American Barristers and there was also a Bahamian corporation called American Barristers. Mr. Uhrig testified that petitioner performed administrative and bookkeeping services until 2004. Mr. Uhrig explained that as part of petitioner's responsibilities she would come to Orlando every couple of weeks and they would often go to First National Bank in Winter Park, Florida, which held the trust accounts.

Petitioner testified that from 2002 to 2004 she was involved in closings related to the Atlantis Trust Fund and was responsible for making disbursements

[*28] to the noteholders. Petitioner testified that some of the accounts that she worked on were moved to Equity Mutual Fund, Inc. Petitioner testified that she would physically go to the bank to request a wire transfer or a check and that the bank was in Fort Pierce, Florida. Petitioner explained that to make a wire transfer, she would meet with customer service and fill out a form which required her signature. In addition, petitioner explained that a counter credit, which was an item on her Bank of America statements for Equity Mutual Fund, Inc., required her to go to the bank in person. Her Bank of America statements for 2003, 2004, and 2005 showed counter credits.

Petitioner testified that she had a debit account for her Equity Mutual Fund, Inc. account and that she was the only one who used the card. Petitioner testified that she never used this card outside the United States.

Petitioner testified that during a 2006 deposition before the Department of Justice she testified that her address was in the Bahamas. She testified that the deposition pertained to her husband's tax case, and she explained that she believed it to be a general question about where she lived with her husband. She also explained that she answered "five years" in reference to how long she lived in the Bahamas, meaning that they had the apartment for five years. Petitioner testified

[*29] that she was not asked whether she lived continuously in the Bahamas or whether she had other residences.

Petitioner testified that her husband was the primary taxpayer and she signed their tax returns as the spouse. In regard to the Bahamian address, petitioner testified that her husband wanted to use the Bahamian address because that was "where he was coming and going from." Petitioner further explained that her husband wanted to be sure that he received everything regarding their tax returns.

E.     Respondent's Position

Respondent contends that petitioner was continuously outside the United States from 2002 until sometime in 2012 and that the running of the period of limitations was suspended. Respondent argues that the tolling period began in 2002 and did not cease thereafter until 2012. To support respondent's argument respondent contends that petitioner provided them with mail service facility addresses or Bahamian addresses. Respondent further contends that petitioner's 2006 signed deposition stated that she lived in the Bahamas.

Respondent argues that even though petitioner made visits to the United States from her residence in the Bahamas, she has not demonstrated how these visits are more than casual temporary visits. Respondent contends that the

**[*30]** Department of Homeland Security and passport records cannot be relied upon to show all of petitioner's international travel.

Respondent contends that petitioner's estimate of days spent outside the United States is unreliable. Respondent supports this contention with evidence that petitioner performed financial transactions via mail and wire.

A IRS revenue officer, Rachel Koenig, testified that Department of Homeland Security records are incomplete and that they do not always list the departures. She further testified that these records were accurate as they related to specific departures and arrivals.

## VIII. Conclusion

Petitioner provided credible testimony about where she lived, and the testimony of Mr. Uhrig corroborated her testimony. Petitioner provided testimony and supporting evidence that she retained a residence in Florida and did not have a permanent residence in the Bahamas. She testified that frequently she visited her husband in the Bahamas, and Department of Homeland Security records show frequent visits to the Bahamas.

Petitioner provided testimony to explain the discrepancies about her address. From the evidence, we conclude petitioner lived in the United States and

[*31] traveled back and forth to the Bahamas. It appears that petitioner's husband moved to the Bahamas, but his residence is not at issue in this case.

Respondent's arguments and evidence were not persuasive that petitioner moved to the Bahamas beginning in 2002 and from 2002 through 2012 was generally and substantially outside the United States and made only casual temporary visits to the United States. Petitioner's conducting of financial transactions by mail or wire does not prove that she was outside of the United States. Respondent relies on the fact that petitioner rented a mailbox. The use of a mailbox does not indicate that petitioner resided outside the United States. The Department of Homeland Security records show consistent travel to and from the United States.

The credible evidence of record fails to establish that petitioner was outside the United States for any continuous period of at least six months from 2002 through June 15, 2003, including casual and temporary visits. Petitioner convincingly testified, and the evidence of record reflects, that petitioner resided and worked in the United States and was never generally and substantially outside the United States from 2002 through 2012. We conclude that when respondent filed the NFTL the 10-year period of limitations had expired with respect to the 1992 trust fund recovery penalty.

**[*32]** Any contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.